Filed 7/15/16  Marriage of Esposito CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of DEBORAH M. and JERRY L. ESPOSITO.<br><br>DEBORAH M. ESPOSITO,<br><br>    Appellant,<br><br>        v.<br><br>JERRY L. ESPOSITO,<br><br>    Respondent. | G051704<br><br>(Super. Ct. No. 03D010235)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Claudia Silbar, Judge.  Reversed and remanded.

Deborah M. Esposito, in pro. per., for Appellant.

Shuff Law Firm, Tamara Shuff Mortensen and Joseph A. Shuff, III, for Respondent.

## I.  INTRODUCTION

A stipulated divorce judgment filed in October 2005 provided that Deborah Esposito, who was represented by counsel, was to pay about $198,000 "forthwith" to her ex-husband Jerry as a community property equalization payment.  On the other hand, the judgment also required Jerry to pay $2,379 a month in spousal support based on his having imputed monthly income of $10,000.  The $2,379 monthly payments would continue until September 2007, when the support figure would step down to $1,400, and then continue at that level until the death of either party.  In December 2005, at the behest of the parties' daughter Leigh, Deborah and Jerry changed their agreement:  Jerry would completely buy out his spousal support obligation in exchange for forgiving Deborah her $198,000 debt to him.  Deborah took the deal based on her understanding that Jerry was in fact unemployed at the time and would "never work again."  An amended judgment was filed December 13, 2005, terminating all possibility of support.  In point of fact, while Jerry had been unemployed during most of the divorce, in September 2005 he landed a job as director of sourcing for a large company.

In March 2014, Deborah brought a motion to vacate the December judgment, based on her contention Jerry had fraudulently misrepresented his employment in December 2005.  The trial court denied the motion based on, among other things, substantial evidence that by 2008 Jerry was communicating with Deborah by email and his emails clearly showed he was employed by the large company that had hired him in September 2005, and therefore Deborah should have discovered Jerry's fraud around 2008.

We reverse the trial court's decision to deny a set aside motion brought by appellant Deborah Esposito.  But we do so on a narrow ground.  We hold only that the trial court erred in concluding that Deborah "should have discovered" in 2008 a violation of her erstwhile husband Jerry's fiduciary duty in late 2005.  Based on this erroneous

conclusion, the trial court ruled Deborah's set aside motion was untimely under Family Code section 2122, subdivision (a).[1]  As we explain below, we return the case to the trial court for further reexamination of Deborah's set aside motion without expressing any opinion concerning how it should turn out.

## II.  FACTS

Deborah and Jerry[2] were married in August 1974, and separated in April 2004.  By the time of separation they had two adult children, a son, Robert, and a daughter, Leigh.

On August 31, 2005, in open court, the parties reached a settlement of most of the issues in their case.  The settlement resulted in a formal judgment being filed on October 18, 2005.  Among the highlights of the October 18, 2005 judgment was an award of net community property assets to Deborah, who was represented by counsel, of $1.148 million, including about $600,000 from the sale of certain property in Newport Beach and the net equity, about $400,000, in the family's Laguna Beach home.  Deborah also got a money market account worth about $100,000.  By contrast, the net assets awarded to Jerry were about $750,000, 80 percent of which consisted of Jerry's $600,000 half of the proceeds of the Newport Beach property.  Accordingly, the October 2005 judgment provided that Deborah was to pay Jerry an equalization payment of about $198,000, "payable forthwith."

The October 2005 judgment, however, left a few ends still loose.  In particular, the parties were asserting various claims against each other for payments made after separation on community debts paid from separate property.  Such claims are often called "*Epstein*" credits.[3]  This case comes to us after a full-scale, contested evidentiary

---

[1]    All undesignated statutory references in this opinion are to the Family Code.
[2]    We use the parties' first names for ease of reference.
[3]    See *In re Marriage of Epstein* (1976) 24 Cal.3d 76 (*Epstein*).

3

hearing, so we must assume the trial judge believed Jerry's testimony and, on balance, he would have come out about $30,000 ahead had the dueling credit battle come to hearing. Deborah thus faced the possibility of paying Jerry another $15,000 on top of the $198,000.

There is no question that Jerry had been unemployed for much of the period of the dissolution proceedings. He had lost his employment with a large candy and pet food conglomerate (Mars, Inc.) back in 2003.[4] In May 2005, he filed a declaration detailing his unsuccessful efforts to find employment in the sourcing-purchasing field at over 40 large firms.

Nor is there any question that, as of August 31, 2005, when the parties reached their stipulated judgment leaving only a few relatively minor issues remaining, he was still unemployed. Jerry did not volunteer the fact that since late July he had been in contact with Technicolor seeking a sourcing position, but as of August 31, he did not know he would get the job.

An offer from Technicolor arrived via letter dated September 8, 2005. Jerry accepted four days later, on September 12. At the time, marital status had yet to be formally terminated. Marital status was not formally terminated until October 18, 2005, the date the written stipulated judgment was filed. The spousal support provisions of that judgment required Jerry to pay Deborah $2,379 a month, based on a finding of *imputed* income of $10,000. The offer that Jerry accepted, though, was for a salary of $7,116 paid fortnightly, which works out to about $15,400 a month, or $185,016 a year. Technicolor also had a bonus program. If Jerry met certain targets, his total compensation would be bumped up another 20 percent. That is, he would be making $222,015 year. That works out to $18,500 a month.

---

4        Deborah's initial petition for dissolution alleged a date of separation in October of 2003, fitting a common pattern of economic and marital difficulties going hand in hand. The October 18, 2005 judgment, however, gives an April, 2004 separation date, but the discrepancy does not significantly affect the issues before us now.

Jerry did not disclose his new job in the period September 12, 2005 (the date he accepted his new job) through October 18, 2005 (the date of the termination of the status of marriage). In fact, his trial brief on those few untied remaining loose end credit issues – likewise filed October 18, 2005 – flatly states he was "unemployed." Deborah's mindset at the time coincided with that false statement. She would later testify that Jerry had "represented . . . that he was not working and was not going to be able to find a job."

Sometime in early December 2005, the couple's daughter Leigh called her father on the telephone to "discuss the fact" her mother did not want to pay the almost $200,000 equalization payment provided for by the October judgment. Leigh was in the same room as her mother and maternal grandparents at the time; it was a family celebration since she had recently graduated from Columbia Law School, had just passed the California bar examination, and had been employed by a large law firm. Leigh asked, on her mother's behalf, whether her parents might be able to "work something else out."

Essentially, Leigh functioned as a human relay in a conversation between her parents about a possible buy-out of Jerry's support obligation. She would later describe what she passed on to her mother from Jerry this way: "He was concerned that my mom was going to get screwed, umm, and that he was offering her a settlement, because he was never going to work again, and, umm, this [the buy-out] would give her something instead of nothing."[5]

By December 13, the parties had entered into another stipulated judgment, the purpose of which was to modify the earlier October 18 judgment and resolve "all

---

[5] There is a tension, if not direct conflict, in the evidence as to whether Deborah or Jerry initiated the buy-out proposal. Jerry's lawyer sought, on cross-examination, to have Deborah admit that *she* "initiated" the possibility of a buy-out in return for a waiver of support. Deborah held fast that she didn't. Daughter Leigh also testified it was Jerry who initiated the call. Jerry testified, on the other hand, that Leigh initiated the call that led to the proposal, with the strong implication she had been asked to do by her mother: "She wanted to discuss the fact that her mother did not want to pay 200,000 in the equivalency charges, that could we work something else out?" Given the procedural posture of the case, it is Jerry's version we must accept.

5

matters" between the parties. As they had discussed earlier, there was an absolute waiver of spousal support in return for forgiveness of the equalization payment. There was also a statement the amount forgiven would not be "includible" in Deborah's taxable income or "deductible" from Jerry's.[6]

Eight years later, in March 2014, Deborah filed the instant proceeding to vacate the December 13, 2005 judgment. She said she had only learned from the couple's daughter in October 2013, that Jerry had fraudulently misrepresented his employment status back in December 2005. Her declaration in support of her motion specifically repeated Jerry's statements to her and their daughter that "he was, and had been for several years, unemployed, and that he had no real hope of finding gainful employment at anytime in the future due to his age." The motion ultimately resulted in a full-scale evidentiary hearing in late 2014.

Leigh admitted in her declaration that she had learned in 2007 her father was employed at Technicolor by performing a search using the website Google. However, Leigh also averred that Deborah had been manifesting delusional ideation since as early as 2004. For example, during the divorce proceedings, Deborah believed Jerry was in the Mafia and was having her followed.[7] Leigh unilaterally kept the information about her father's employment from her mother until October 2013.[8]

Leigh's declaration said that in 2008, she was appointed by a court to be Deborah's "medical Conservator," but that (limited) conservatorship was terminated in

---

[6]    Spousal support is usually deductible to the payor spouse, and includable to the payee spouse. (See Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2015) ¶ 10:15, p. 10-7 ["Unless otherwise designated, spousal support (referred to by the Code as 'alimony') is taxable to the recipient and deductible by the payor."].) *Whether* Jerry's forgiveness of Deborah's equalization payment would have otherwise been deductible as spousal support has not been briefed by the parties and we decline to expound on the tax ramifications of that clause in the judgment.

[7]    The couple's son Robert likewise signed a declaration to that effect.

[8]    Leigh's exact words: "Given my mother's fragile mental health, I did not feel that she was able to handle my discovery that my father had lied about his employment status during the divorce. Indeed, I feared that her illness would be further exacerbated by this knowledge and, for that reason, decided not to tell her what I had found."

late May 2009.  As Leigh described it, "[b]etween 2009 and 2013, my mother became more and more stable and recently achieved a state of relatively strong mental health."[9]

For his part, Jerry testified that he did not actually *say* he was unemployed back in December 2005, when the buy-out was being discussed.  Rather, his version of the discussions was that Deborah and his daughter both had "a very low expectation that [he] was employable."  And while Jerry didn't go out of his way to disabuse Deborah and his daughter of that low expectation at the time, he did claim he never actually said he was "unemployed."  As to employment *qua* employment:  "It was never asked and it was never offered."  Rather, he told Leigh (and indirectly Deborah) something literally true but misleading.  His exact words were:  "I can't believe that just because of my age and my last salary, the position, that people won't hire me."

The core of Jerry's evidence consisted of a series of emails from him to Deborah in the period August 2008 through February 2010.[10]  The body of the emails covered such innocuous topics as Syracuse's football team and their son's trip to France.  The main reason for the introduction into evidence of the emails was the prominent address block right under the content, which made it plain that Jerry was employed and sending the email from his work.  Three of the emails had address blocks that included these words:

"Jerry L. Esposito, C.P.M.

"General Manager, Sourcing

"Sourcing Mission:  Passionate People Creating Value to Fuel Growth

"Technicolor [logo omitted]

---

[9]     Attachments promised in Leigh's declaration that might have thrown more light on the nature of Deborah's purported mental problems, such as the minute order lifting the conservatorship and a letter from the doctor who diagnosed Deborah as suffering from "Delusional Disorder," are not in the clerk's transcript where one would expect to find them, so we do not know if they were forthcoming.

[10]     The evidence included several more emails, but those were not directly to Deborah; instead they were to Leigh.

"by Thompson

"[address on] Mission Oaks Blvd.

"Camarillo, CA [zip omitted]

"W: [phone number omitted]

"C: [phone number omitted]"

Jerry also had a work associate, Lisa Hunt-Weaver, testify. It turned out that Hunt-Weaver met Deborah at a birthday party for daughter Leigh in December 2009, and during that conversation Hunt-Weaver mentioned Jerry's employment to Deborah. Hunt-Weaver described what she told Deborah this way: "I had mentioned that, you know, the reason we knew Jerry was through work and that we worked with him at Technicolor."

After oral argument in December 2014, the trial court issued a minute order denying Deborah's motion. The trial court ruled the one-year statute of limitations under section 2122 had run, and specifically cited *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797 (*Fox*) as being "on point."[11] The trial court's statements in its minute order were later reiterated in a formal "Findings and Order After Hearing" filed January 30, 2015, denying Deborah's set aside motion. Deborah, has timely appealed from the order denying the motion.

---

11      After citing *Fox*, the court's minute order went on to say: "The court finds the petitioner knew or should have known in 2008 that the respondent [Jerry] was employed. That is six years ago. The court finds the one-year statute of limitations ran from that date also. [¶] The facts demonstrate that the respondent was on regular basis communicating with the petitioner by way of email throughout 2008. In 2008 respondent was employed and when he was communicating by email with the petitioner, he was utilizing his employment email on a regular and consistent basis. [¶] The petitioner admits she received these emails and that she received the majority of the emails. Petitioner denies having read the portion of the email which states respondent's name, position, address, telephone number and company. . . . [¶] The court finds that a moving party on a statute of limitations issues, as it relates to, knew or should have known, has to exercise some reasonable diligence. [¶] The court finds it is not reasonable for a person to wait six years and then come to court and allege she did not know he was employed. A party has an obligation to exercise some due diligence. [¶] *On the other hand, further investigation was not required in 2008, as it is clear, pursuant to respondent's emails, that he was employed.*" (Italics added.)

     The italicized words show that the trial court stopped its analysis in 2008, thus the sole basis of its rejection of the motion was the statute of limitations as found in section 2122.

## III.  DISCUSSION

A. *Preliminaries*

We first must disabuse Jerry of the idea that he was *not* obligated to disclose his new employment in the period prior to the formal termination of the status of marriage on October 18, 2005.  Jerry argues his fiduciary duties of disclosure ended on August 31, 2005, the date of the settlement.  For that proposition Jerry cites section 2102, subdivision (c) for an early end date of his fiduciary duty.  The statute provides:  "From the date of separation to the date of a valid, enforceable, and binding resolution of all issues relating to child or spousal support and professional fees, each party is subject to the standards provided in Section 721 as to all issues relating to the support and fees, including immediate, full, and accurate disclosure of all material facts and information regarding the income or expenses of the party."

There are at least two reasons Jerry's assertion is incorrect.  First—and most obvious—Jerry had an application in at Technicolor by the end of July 2005, but didn't disclose it, and that was prior to the August 31, 2005 settlement.  Second, section 721 imposes fiduciary duties on "spouses," and in this case marital status was not terminated until October 18, 2005, not August 31, 2005.  Jerry was still Deborah's "spouse" up to October 18.

We must further note, preliminarily, that Deborah makes no argument on appeal that her own (possible) mental incapacity in the period 2005 through 2009 (if we credit Leigh's lay diagnosis of her mother's mental health) requires setting aside the December 2005 judgment, under section 2122, subdivision (d).  It would not be in her interest to do so:  Under that statute, a family law litigant has only two years from the "entry of judgment" to bring a motion to set aside a judgment.

B. *Section 2122*

Deborah's appeal, rather, centers on subdivision (a) of section 2122, which expressly requires a motion to set aside a family law judgment within one year of the date the complaining party discovered or "should have discovered" the fraud.[12]

The "should have discovered" standard is often shorthanded to the phrase "inquiry notice." (See *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1391 ["The doctrine of inquiry notice is usually invoked when the issue is whether a statute of limitations has expired before a plaintiff should have discovered a cause of action."].) The key Supreme Court decision on the rules governing inquiry notice in the context of statutes of limitations using "should have discovered" language is *Fox, supra,* 35 Cal.4th 797. Indeed, the *Fox* court *equated* "should have discovered" language in various statutes of limitations with the principle of "inquiry notice." (See *Id.* at p. 807.) *Fox* also appears to be our Supreme Court's own "go-to" case for explication of the inquiry notice rule in ordinary civil contexts. (See *Quarry v. Doe I* (2012) 53 Cal.4th 945, 960 [quoting *Fox*]; *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 634 [quoting *Fox*]; *Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 801 [quoting *Fox*].)

The key passages from *Fox* stress two basic principles – first, a suspicion principle, and second an opportunity principle. Specifically:

---

[12]    The language of the section 2122, subdivision (a) is: "The grounds and time limits for a motion to set aside a judgment, or any part or parts thereof, are governed by this section and shall be one of the following: [¶] (a) Actual fraud where the defrauded party was kept in ignorance or in some other manner was fraudulently prevented from fully participating in the proceeding. An action or motion based on fraud shall be brought within one year after the date on which the complaining party either did discover, *or should have discovered*, the fraud." (Italics added.)

On appeal Deborah also mentions subdivision (f) of section 2122, which also has a one-year statute of limitations for failure to comply with the disclosure requirements set out in section 2100 et seq. Though the argument was waived at trial level, we may observe that the same dynamics which govern subdivision (a) also govern subdivision (f). Obviously cases of actual fraud will often involve failure to comply with disclosure requirements. It thus makes no difference that Deborah did not also rely on subdivision (f) at trial because if the one-year statute didn't run as to one, it didn't run as to the other.

(1) *The suspicion principle*. A litigant should have discovered a claim when he or she "'has reason at least to suspect a factual basis for'" the elements of that claim. (*Fox, supra*, 35 Cal.4th at p. 807, quoting *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398 (*Norgart*).) The *Fox* court defined "elements" to simply mean wrongdoing, causation, and harm. (*Fox, supra*, 35 Cal.4th at p. 807, explaining *Norgart, supra*, 21 Cal.4th at p. 397.) The *Fox* court further elaborated: "[W]e look to whether the plaintiffs have reason to at least suspect that *a type of wrongdoing has injured them*." (*Fox, supra*, 35 Cal.4th at p. 807, italics added.)

(2) *The opportunity principle*. Once a litigant becomes aware of an injury, he or she is required to "conduct a reasonable investigation" and is charged with the knowledge such an investigation would have revealed. (*Fox, supra*, 35 Cal.4th at p. 808.) Put another way, if a complaint on its face shows a claim would be time-barred, the claimant must show both the time and manner of the discovery of the claim and "'the inability to have made earlier discovery despite reasonable diligence.'" (*Id*. at p. 808, quoting *McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 160 (*McKelvey*).) The idea that a claimant must in fact show he or she could not have reasonably discovered facts supporting their claim has in fact been reiterated by the court. (*Fox, supra*, 35 Cal.4th at p. 809.)[13]

Applying *Fox*, we are forced to conclude there was insufficient evidence that Deborah should have known, in 2008, that Jerry had, *back in 2005*, committed fraud. The evidence of the emails *only* shows Jerry had a job by *2008*, not that he had hidden

---

[13]    *Fox* itself came to the Supreme Court on demurrer sustained without leave to amend, so the high court made a point of noting that the plaintiff's allegations had to be taken as true. (See *Fox, supra*, 35 Cal.4th at p. 811.) The case arose out of a perforation in the small intestine allegedly caused by a defective surgical stapler. (See *id.* at p. 804.) The manufacturer of the stapler contended the applicable one-year statute of limitations had run. However, accepting as true the plaintiff's allegation that the plaintiff had no reason to know of the *cause* of the perforated intestine until the deposition of a particular physician, the *Fox* court held that the plaintiff should have been allowed to amend her complaint to allege the time of the deposition as the time of the discovery of the injury, which amendment, if allowed, would have made her claim timely. (*Id.* at p. 811.)

the fact of an existing job in 2005. The element of *knowledge of wrongdoing* was missing. (See *Fox, supra*, 35 Cal.4th at p. 807.) The same goes for the birthday party evidence from December 2009. Nothing in the record indicates Hunt-Weaver told Deborah that Jerry had been working at Technicolor back in 2005. We thus conclude the trial court erred in deciding the statute of limitations issue against Deborah.

C. *Remand Required*

Our conclusion on section 2122 does not, however, *necessarily* mean that the court should have granted Deborah's motion. It only means that the court must now evaluate Deborah's motion on the merits because it is not time-barred under section 2122. There are issues that are yet to be decided, but they are issues we cannot address in the first instance. All we can decide is the one dispositive issue of whether the trial court correctly applied section 2122 to these facts. Since it didn't, we reverse the order denying Deborah's set aside motion and remand for reconsideration of her set aside motion consistent with this opinion. Deborah will also recover her costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

FYBEL, J.

12